IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | 8:08CR236 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | REPORT AND |
| | ) | |
| DAMION MATTISON, | ) | RECOMMENDATION |
| | ) | |
| Defendant. | ) | |

    This matter is before the court on the motion to suppress filed by defendant Damion Mattison (Mattison) (Filing No. 25).[1]  Mattison is charged in the Indictment with the possession with intent to distribute more than 500 grams of cocaine in violation of 21 U.S.C. § 841(a)(1).  **See** Filing No. 1.  Mattison seeks to suppress evidence derived from his encounter with law enforcement officers at the Greyhound Bus Terminal in Omaha, Nebraska, on April 28, 2008, and an ensuing search of his luggage resulting in the seizure of controlled substances and other items the government seeks into introduce into evidence.

    An evidentiary hearing was held on Mattison's motion on August 20, 2008.  Mattison was present for the hearing along with his appointed counsel, First Assistant Federal Public Defender Shannon P. O'Connor.  The United States was represented by Assistant U.S. Attorney Nancy A. Svoboda.  During the hearing, the court heard the testimony of Investigators Jason Scott (Investigator Scott) and Alan Eberle (Investigator Eberle) of the Nebraska State Patrol (NSP).  The court received into evidence Exhibit 1 - Photograph of cooler; Exhibit 2 - Photograph of cooler; Exhibit 3 - photograph of exterior of cooler; Exhibit 4 - red cooler (photograph substituted for cooler following evidentiary hearing); Exhibits 4A to 4K - 11 photographs of Exhibit 4; and Exhibit 101 - red cooler (for demonstrative

---

[1] As a convenience, this document contains certain cross-document hyperlinks to documents previously filed in this case.  This document also contains links to the Nebraska local rules and legal citation from the federal reporters.  The hyperlinked documents appear in blue underlined text.  Except with regard to the local rules, access to the hyperlinked material is subject to fees pursuant to user agreements.  The hyperlinks may be accessed without PACER fees by use of the public computer terminal in the Clerk's office.

purposes which was substituted with a photograph). A transcript of the hearing (TR.) was filed on August 25, 2008 (Filing No. 39).

## FINDINGS OF FACT

On April 28, 2008, Investigators Scott and Eberle together with NSP Investigators Lutter and Rasgorshek and DEA Special Agent Orduna were assigned to the Commercial Interdiction Unit (CIU) in Omaha, Nebraska (TR. 5-7). The CIU seeks to stem the flow of drugs and other illegal activity by concentrating on commercial transportation facilities (TR. 5). Between 5:30 and 6:00 in the morning of April 28th, the eastbound Trailways bus arrived at the bus terminal in Omaha (TR. 7; 55). The bus, which was bound for Chicago, came from Denver and originated in California (TR. 7). After the bus arrived, the passengers are required to disembark and enter the terminal while the bus personnel unload the baggage destined for Omaha and then service the bus by cleaning, emptying the restrooms, refueling, etc. (TR. 8). While the bus is being serviced, the CIU officers look at the luggage taken off the bus, and look at the luggage that is left on the bus, both underneath in the luggage compartment and above in the passenger compartment (TR. 9). The investigators were dressed in civilian clothing, jeans and t-shirts and were armed but did not have their weapons exposed (TR. 15).

While Investigator Eberle was on board the bus after the passengers disembarked, he observed a red and white cooler on a seat (TR. 56). It appeared that the sides of the cooler were bulging (TR. 56). It appeared that the inner portion had been separated from the exterior portion and it appeared that something had been stuffed in between, causing a bulge (TR. 56-57). Investigator Eberle picked up the cooler and, using his flashlight, observed various marks or scratches on the cooler lining (TR. 58). Investigator Eberle contacted Investigator Scott and informed him about the cooler (TR. 58-59). Investigator Scott came on board the bus, looked at the cooler, and agreed with Investigator Eberle that the cooler was indicative of containing contraband based on past experiences with the CIU (TR. 11). The investigators spoke with the driver and received permission to remain on the bus during the reboarding process to see if any of the passengers would assert control

over the cooler, and if not, perform an abandoning process by asking all of the passengers if the cooler belonged to them (TR. 59-61).

Investigator Eberle positioned himself two seats behind the seat where the cooler rested as the passengers began to reboard (TR. 61). Investigator Eberle was kneeling on the seat with his arms on the back of the seat in front of him (TR. 61). Investigator Eberle observed Mattison reboard the bus, go the seat where the cooler rested, manipulate a bag in the overhead baggage compartment, pick up the cooler from the seat, and set the cooler on the floor between his legs (TR. 62). Investigator Scott was positioned forward of the seat where Mattison was seated (TR. 12). Investigator Eberle moved up a row of seats to the seats behind Mattison, leaned over the seat to the right of Mattison and spoke to Mattison (TR. 63). Investigator Eberle stated "Excuse me, sir," and displayed his credentials to Mattison (TR. 64). Investigator Eberle told Mattison he was an investigator with the state police, that Mattison was not under arrest or in any kind of trouble, and asked Mattison if he could speak with him (TR. 65). Mattison looked at Investigator Eberle but did not respond (TR. 65). Investigator Eberele asked Mattison if he had a bus ticket or any form of identification (TR. 65). Mattison looked in some belongings, produced his identification but not a bus ticket (TR. 65). Investigator Eberle asked Mattison what his final destination was, and Mattison responded it was Michigan (TR. 66). Investigator Eberle asked about Mattison's itinerary and Mattison said he was coming from California after having flown there (TR. 67). Mattison's absence of a ticket in light of his scheduled itinerary added to Investigator Eberele's suspicion that there was criminal activity afoot (TR. 67). Investigator Eberle handed back Mattison's identification and asked Mattison if he had any luggage or personal belongings on the bus (TR. 67). Mattison said he had a bag in the overhead, the cooler in question on the floor, and a blanket and pillow which were next to him (TR. 67). Investigator Eberle told Mattison that they watch for individuals possibly transporting illegal items on the bus and asked Mattison if he had anything illegal with him (TR. 67). Mattison stated no (TR. 68).

Investigator Eberle asked if they could conduct a search of his personal belongings along with the cooler and his person (TR. 68). Mattison said that would be fine (TR. 68). Investigator Eberle reached into the overhead compartment and began to pull down

Mattison's bag (TR. 68 - 69).  Mattison opened the cooler and Investigator Eberle asked Mattison if he could slide the cooler over to Investigator Scott for officers' safety sake (TR. 17).  Mattison slid the cooler over to Investigator Scott who was positioned forward of Mattison on the bus (TR. 18).  Investigator Scott testified it took only five seconds for him to pop the inside liner and observe gray duct-taped packages inside (TR. 18).  Thereupon, Mattison was placed in handcuffs, was escorted off the bus with his belongings, and taken into a back room of the bus terminal (TR. 72 -73).

In the terminal, the cooler was searched further and a kilogram of cocaine and a kilogram of marihuana were found in the gray duct-taped packages (TR. 73).  Mattison, after being advised of his *Miranda* rights, declined further interview without an attorney (TR. 73).  The investigators did not question Mattison further (TR. 73).

## LEGAL ANALYSIS

The defendant urges the court to grant the motion to suppress for two reasons.  The defendant argues the investigators conducted an illegal search by manipulating the cooler prior to seeking consent to search.  Further, the defendant contends the consent to search was involuntary under the circumstances because the defendant was on a bus with the investigators taking intimidating postures and asking intrusive questions.

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated."  U.S. Const. amend. IV.  The Fourth Amendment protects an individual's privacy interests in the contents of personal luggage. *United States v. Place*, 462 U.S. 696, 707 (1983); *United States v. Gwinn*, 191 F.3d 874, 878 (8th Cir. 1999).  However, not every interference with an individual's luggage constitutes a search or a seizure within the meaning of the Fourth Amendment. *Gwinn*, 191 F.3d at 878.  A seizure occurs only when law enforcement "meaningfully interfere[s]" with an individual's possessory interests in the property. *United States v. Va Lerie*, 424 F.3d 694, 701 (8th Cir. 2005) (en banc) (**quoting** *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)).

Courts focus on three factors when considering whether law enforcement's interference with personal belongings constitutes an unlawful seizure.  The court must

determine whether law enforcement's detention of the parcel (1) delayed a passenger's travel or significantly impacted the passenger's freedom of movement; (2) delayed the parcel's timely delivery; or (3) deprived the carrier of its custody of the parcel. *United States v. Va Lerie*, 424 F.3d 694, 707 (8th Cir. 2005). Under any one of these conditions, the government must show there was sufficient information at the time of the seizure for a reasonable officer to suspect the parcel contained contraband or evidence of illegal activity. See *id.*

Here, since the officer's viewing and manipulation of the cooler occurred when the passengers were away from the bus, it did not delay or impact any passenger's travel or freedom of movement. The officer's conduct did not have any impact on the delivery or custody of the cooler. Accordingly, the officer's conduct did not meaningfully interfere with the defendant's possessory interest in the cooler. However, the officers did have sufficient information to suspect the parcel contained contraband based on their cursory observations of the bulging cooler. In any event, no evidence was discovered based on the manipulation and, even assuming a Fourth Amendment violation, the defendant's consent to search the cooler validated the subsequent search. See *United States v. Grajeda*, 497 F.3d 879, 882 (8th Cir. 2007).

A consent search must be voluntary. The Fourth Amendment test for valid consent to search is that the consent be voluntary, and such "[v]oluntariness is a question of fact to be determined from all the circumstances." *Ohio v. Robinette,* 519 U.S. 33, 40 (1996). Some personal characteristics that aid in determining voluntariness of consent are age, intelligence, whether an individual was under the influence of drugs or alcohol, whether an individual was read his *Miranda* rights, and whether an individual had experienced prior arrests. See *United States v. Comstock*, 531 F.3d 667, 676-77 (8th Cir. 2008) (listing factors). A court may also look at environmental factors including, the period of time that the individual was detained; whether the police threatened, physically intimidated, or punished the individual; whether promises or misrepresentations were made upon which the individual relied; whether the individual was in custody or under arrest at the time of consent; whether the consent occurred in a public or secluded place; and whether the

individual objected or stood by silently while the search occurred. *Id.* (**citing** *United States v. Saenz*, 474 F.3d 1132, 1137 (8th Cir. 2007)).

"When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given. This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority." *Bumper v. North Carolina*, 391 U.S. 543, 548-49 (1968) (footnotes omitted). "In order for a consensual search to be valid, consent must actually be given (either express or implied), and the person giving consent must have (actual or apparent) authority to do so." *United States v. Williams*, 521 F.3d 902, 906 (8th Cir. 2008). The government bears the burden of proving voluntary consent to search by a preponderance of evidence. *United States v. Esquivel*, 507 F.3d 1154, 1159-60 (8th Cir. 2007).

In the present case, no evidence suggests the defendant was threatened, intimidated, or promised anything in return for giving consent to search the cooler and other personal items. Neither the positioning of the investigators nor questions posed by the investigators turned the voluntary encounter into an investigatory detention or custodial interrogation. Mattison voluntarily consented to the officer's search by stating "that would be fine," opening the cooler and sliding the cooler to the investigator. The conduct led the investigators to reasonably believe Mattison consented to the search of his person and belongings, including the cooler. Although the officers did not specifically tell Mattison that he had the right to refuse a search, the officers asked for and received permission to search. Mattison appeared to understand what was going on, followed directions and otherwise responded appropriately to the officers. The court finds Mattison voluntarily gave consent for the officers to search his belongings, including the cooler. Upon consideration,

**IT IS RECOMMENDED TO CHIEF JUDGE JOSEPH F. BATAILLON that:**

Mattison's motion to suppress (Filing No. 25) be denied.

### ADMONITION

Pursuant to NECrimR 57.3 any objection to this Report and Recommendation shall be filed with the Clerk of the Court within ten (10) business days after being served with a

copy of this Report and Recommendation.  Failure to timely object may constitute a waiver of any objection.  The brief in support of any objection shall be filed at the time of filing such objection.  Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

DATED this 8th day of October, 2008.

BY THE COURT:

s/Thomas D. Thalken
United States Magistrate Judge